## WARD *v.* COWDREY.

*(Supreme Court, General Term, First Department. January 28, 1889.)*

1. CONTRACTS—CONSTRUCTION—PAROL EVIDENCE—CONTEMPORANEOUS AGREEMENT.
    Where a written settlement contains only a part of the terms previously agreed on, those parts of the agreement omitted therefrom will be considered and enforced as a collateral undertaking, if not inconsistent with the writing.

2. SAME—PROMISE TO PAY DEBTS TO THIRD PERSON.
    Where one of the items alleged to have been so omitted from the written agreement was a promise by defendant's testator to pay a third person money which it appeared had been obtained from him by plaintiff, who was agent for the testator, on the agent's personal draft, to pay for supplies furnished testator's mill, and it is shown that testator after the settlement gave plaintiff a certificate of commendation, and had full confidence in his integrity, the promise may be proven by oral evidence.

3. SAME.
    A promise to pay to a third person a debt due him by the promisee may be enforced by the promisee against the promisor's estate, without waiting for the third person to sue thereon, in the absence of evidence that he knew of and acquiesced in the promise.

Appeal from judgment on report of referee.

Action by Charles H. Ward against Jane Hartley Cowdrey, as executrix of Nathaniel A. Cowdrey, deceased. Judgment for plaintiff for $3,687.50, and defendant appeals.

It appears from the evidence that on the 21st day of August, 1883, Nathaniel A. Cowdrey, the defendant's testator, wrote a letter to Charles H. Ward, the plaintiff, who was then at Durango, Mexico, in the employ of Cowdrey, as the manager of certain mines and ore-mills there belonging to him, asking Ward to continue in his employ for an indefinite time, "so long as we can get along harmoniously and satisfactorily together," each "to give the other sixty days' notice before he quits, or before he is wanted to leave." Cowdrey says: "I will give you (1) a definite salary of $150 per month, house-rent free upon my premises, and your necessary expenses when absent from Carmen on my business. (2) I will give you five per cent. of the net proceeds of my mines and mills until the same, with the salary of $150 per month, reaches ten thousand dollars per annum, at which point your pay shall rest, so far as salary and interest in net profits are concerned. But if you get out one million and upwards net, then I will give you, in lieu of the ten thousand dollars, two and one half per cent. net profits without any limit, *i. e.*, if you get out two million you are to have $50,000 for your part. (3) The store was no part of my contract. I have no objection to your having a half of it, or more or less, so long as it sells goods to my laborers at a reasonable profit, and does not sell tokillio or other intoxicating drinks. (4) I will allow you to take 3-10 interest in the three mines denounced by you on my lands, provided you organize and take title 5-10 to me and 2-10 to me in trust for such others as I think ought to be associated with me. My offer of compensation to you for services is subject to my right to sell at any time. If I do so, and the purchasers do not continue the agreement with you, then I will give you a present of from $5,000 to $10,000, depending upon the price at which I sell." Ward accepted the terms of this proposition, and continued in Cowdrey's employ under it till about March 3, 1884. Mr. Cowdrey went to Mexico at that time, and arrived in Carmen about the 1st of March, and, without any notice to Ward, discharged him from his employ, and terminated the above contract. Ward protested against the discharge, and claimed that he was entitled to 60 days' notice under the contract, and demanded that

Cowdrey settle with him before he turned over the property. Thereupon they sat down in Ward's house; Ward produced the contract above set forth, and they began to talk and settle off each part of the contract separately. (1) They settled the cash salary of $150 per month for the two months by Cowdrey's giving Ward credit for $300 on a note of $500 that Ward owed him. (2) They then passed on to the second head of the contract, and Ward claimed that during the next 60 days he would be entitled to four or five thousand dollars. Ward had made up an estimate, and showed it to Cowdrey, but the latter said it was hard to make an estimate; that it was unsatisfactory; and they discussed it very considerably. They finally concluded that in lieu of this percentage of 5 per cent. Mr. Cowdrey would pay the sum of $3,000 to one Vivanco, at Parral, Mexico, to whom Ward stated that he owed that amount. Cowdrey was to pay it in three or four days thereafter, when they should reach Parral, whither they were both to go. (3) Mr. Ward claimed next that he should have the profits of the store for 60 days. Mr. Cowdrey objected to that, and said he did not consider that Ward was entitled to the store profits. They seem to have dropped the subject there, and not to have referred to it again. The profits of the store were $1,000 per month. (4) They next passed to the three-tenths interest of Ward in the mines denounced by him and referred to in the fourth section of the contract. He told Cowdrey that he had spent $900 in developing those mines, and that money would now be a dead loss to him. Cowdrey undertook to see that Fuller, one of the new lessees, should take the mines, and pay Ward the money; they afterwards went out and saw Mr. Fuller, and made the arrangement with him, which was that the money was to be paid to Ward at Parral. (5) Ward then demanded that Cowdrey should arrange it so the parties who leased the property would take the store goods then remaining off his hands. Cowdrey procured Fuller to take these goods, and pay Ward the money when they arrived at Parral. (6) Ward's next demand was that Cowdrey should pay him for the goods already sold to the men "on account of the pay-roll." "He wanted Mr. Cowdrey to settle that, which he agreed to." The money was paid afterwards. (7) The next and final subject of conversation is found at folio 47. "Ward claimed an interest in the estate; that he was to have a certain percentage of the sale of the property, and if he went away there would be no chance for that. Mr. Cowdrey told him he shouldn't lose anything if they did sell, and he would allow him at least $10,000 if they did not sell within three years." This last agreement was put in writing, and reads as follows:

"CARMEN, DURANGO, March 3, 1884.

"For one dollar and other valuable considerations, the receipt whereof is acknowledged, and considering the agreements and promises existing between Chas. H. Ward and myself, I hereby agree to pay Chas. H. Ward, as follows: I will allow three hundred dollars, Mexican silver, on his note now held by me for five hundred dollars, United States currency. Also one-tenth of the net proceeds of the sale of Sestin & Carmen properties and mines, and I guaranty that said one-tenth net proceeds shall not be less than ten thousand dollars United States currency. The net proceeds shall be the amount left after deducting from the gross proceeds of sale the following: (1) The original cost of above properties and mines, and the improvements I have made thereon. (2) If sold while lease is in force, the amount I shall pay to terminate said lease. (3) The amount I allowed Chas. H. Ward in our settlement in 1882. At the expiration of three years from this date, if I have not sold the properties then, I agree to pay Chas H. Ward the above guaranteed amount, which shall be in full for his above one-tenth net interest. In effecting sale, if I desire Ward's services, he shall give them free of all charge.

"N. A. COWDREY.

"On my part I agree to render such free services.

"CHAS. H. WARD."

This paper was drawn by Ward, at Cowdrey's dictation. It was drawn in "several shapes," and changed a good many times. Mr. Cowdrey was a well-known lawyer of this city.

Argued before VAN BRUNT, P. J., and BRADY and DANIELS, JJ.

*A. C. Butts*, for appellant.    *M. A. Kellogg*, for respondent.

BRADY, J.    What is called the "last paper writing" between the parties, (appearing in the statement of facts prepared by the respondents, and which is regarded as substantially correct,) bearing date March 3, 1884, was executed, it is true, after the parties had consulted about and determined upon the result of their business transactions. This distinctly appears from the statement in that paper: "For one dollar and other valuable considerations, the receipt whereof is acknowledged, and considering the agreements and promises existing between Charles H. Ward and myself." But it also distinctly appears that it did not embrace all the items or terms of the settlement, exclusive of the Vivanco claim. Other matters were arranged for, which were not included in that paper. This controversy does not depend, therefore, wholly upon the construction of that instrument, or indeed its enlargement by parol. It cannot be regarded as controlling except as to the items contained in it, inasmuch as it does not embrace all the disputed items which were settled and to some extent paid. Even when an executive agreement has been made, if the fact be shown that there was a distinct collateral verbal agreement between the parties not inconsistent with the original contract, the law does not prohibit such distinct collateral agreement from being enforced. *Jones* v. *Jones*, 18 Hun, 442. And this enunciation is sustained by numerous authorities. In other words, if it be clear upon the whole evidence that the instrument relied upon or involved did not contain the whole agreement, and a distinct collateral contract was proved, not inconsistent with the written one, the law will not prohibit the enforcement of such a collateral undertaking. The facts in this case show that the payment of the $3,000 arising out of the Vivanco claim, which was the only one allowed by the referee, was not embraced in the written agreement, but was a part of the compromise agreed upon by Mr. Cowdrey, together with others not mentioned. The testimony relating to it, and sufficient to sustain it, was received, it seems, substantially without objection. It must be said, however, that the written paper containing a part only of the terms of settlement or compromise does not rise to the dignity of a contract *ab origine*. It relates, it is true, to contracts made and entered upon, the results and the responsibilities incurred, and their adjustment by the parties whose business relations were to be severed and ended, but in part only, and no court would exclude from examination and consideration anything omitted from a memorandum under such circumstances. The same rule applicable to a receipt in full should prevail where the settlement is partly in writing and partly oral. The whole subject should be open to discussion when a controversy arises between the parties under such circumstances. This result cannot well be avoided. In *McDougall* v. *Cooper*, 31 N. Y. 498, it was held that where there has been an accounting and settlement, if it afterwards appear that a clear mistake occurred by the omission to include a considerable sum of money, an action will lie to correct such mistake, and to collect such sum, and this although the settlement was in writing, and a due-bill given. The proposition that the promise to pay Vivanco could be enforced by him against the estate of Mr. Cowdrey is untenable in the absence of proof that he knew of the arrangement, and accepted or acquiesced in the proposition. The plaintiff was not obliged to wait his pleasure if he knew anything about it. He could, as he did, bring an action, and leave the defendant to prove such facts as deprived him of the right to enforce his claim. The promise of payment established

the liability of Mr. Cowdrey to that amount as one of the items in the compromise, and rested upon a consideration duly discussed and disposed of.

The appellant complains of the unreliability of the evidence by which the demand is established, but as long as oral admissions and statements are received to prove a claim they must be considered and given their proper force and effect. The proof here was that the Vivanco claim was for supplies to the mill of Mr. Cowdrey, for which the plaintiff had made his personal draft, and obtained in that way the money from Vivanco. There was no contradiction of this testimony, and it was shown that Mr. Cowdrey, after the settlement, gave a certificate commending the plaintiff. It also appears from the letters written by Mr. Cowdrey that he had full confidence in the plaintiff's integrity. These incidents were well calculated to impress the learned referee with the good faith of the asserted claim, and make the admissions and statements now denounced acceptable. The examination of the case leads, therefore, to the conclusion that the judgment appealed from cannot be disturbed, none of the exceptions taken being of sufficient force to require a different result. The questions considered are the only ones which demand particular mention. Order accordingly. All concur.